UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JAMES "BRYAN" LAKE and TERRY HALL,<br><br>Plaintiffs,<br><br>vs.<br><br>FIRST NATIONAL INSURANCE COMPANY OF AMERICA,<br><br>Defendant. | Case No: C 09-00797 SBA<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Dkt. 42 |

Plaintiffs bring this diversity breach of contract and insurance bad faith action against Defendant. The parties are presently before the Court on Defendant's Motion for Summary Judgment. Dkt. 42. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b).

**I.     FACTUAL BACKGROUND**

  **A.     THE POLICY**

Defendant issued homeowner's policy number OA3407348, which went into effect on December 7, 2006 and was cancelled, for unspecified reasons, on March 7, 2007 ("Policy"). Dkt. 47, Wyatt Decl., Ex. 1. The Policy provided coverage for the premises located at 18370 Rainier Avenue in Hayward, California, with a $162,736 limit for personal property coverage and a $1,000 deductible. Id. The Policy contains the following pertinent provisions:

> 3.     An Insured's Duties After Loss. In case of a loss to which this insurance may apply, you must perform the following duties:
>
> * * *
>
> e.     prepare an inventory of the loss to the building and damaged personal property showing in detail the quantity, description, replacement

cost and age.  Attach all bills, receipts and related documents that justify the figures in the inventory;

* * *

7. Appraisal.  If you and we do not agree on the amount of the loss, including the amount of actual cash value or replacement cost, then, on written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within 20 days of such demand ….

Id. at 36-39.

### B.   THE BURGLARY

Plaintiffs allege that on December 15, 2006, they purchased residential property located at 18370 Rainier Avenue in Hayward, California.  Dkt. 44, Def.'s RJN, Ex. 2, ¶ 1.[1]  At the time of the purchase, the house was "in bad shape" and filled with "[w]all-to-wall debris and paper and antiques."  Dkt. 45, McCurdy Decl., Ex. 3 (Lake Dep. Tr.), 51:9-11; Ex. 4 (Hall Dep. Tr.), 17:21-18:5.  Plaintiffs allege that, as part of the purchase, they gained title to the personal property left behind by the previous owner.  RJN, Ex. 2, ¶ 1.

On December 17, 2006, burglars allegedly stole several items of personal property that the previous occupant of the house had left behind.  Id., ¶ 2.  Plaintiffs had not obtained appraisals for any of the personal property before the burglary.  McCurdy Decl., Ex. 3, 25:13-26:10.  Plaintiff James "Bryan" Lake ("Lake") testified that Plaintiffs had not gone through the property in any detail before the burglary.  Id., 37:2-7.

Plaintiffs currently allege that the following items were stolen and they are entitled to additional policy benefits for these items, beyond what Defendant has already paid: (1) Blackfeet headdress and outfit; (2) two Navajo blankets; (3) a Civil War jacket; (4) a California Republic $20 gold piece; (5) a collection of assorted knives; (6) a carved staghorn service for four; and (7) Civil War patents and a boot (collectively, "Stolen Items").  RJN, Ex. 2, ¶¶ 1, 2;

---

[1] Defendant asks the Court to take judicial notice of the original and first amended complaints filed in this action in the Superior Court of California, County of Alameda, prior to removal.  Plaintiffs have not opposed this request.  Pursuant to Federal Rule of Evidence 201, Defendant's request for judicial notice is granted.

McCurdy Decl., Exs. 41 and 42.  Some of the Stolen Items, including the Civil War jacket, were previously owned by Bob Ryan, the prior resident of the home.  RJN, Ex. 2, ¶ 1.

### C. PLAINTIFFS' CLAIM

On or about December 29, 2010, Plaintiff Terry Hall ("Hall") notified Defendant of the burglary and loss.  Wyatt Decl., ¶ 6.  Hall also submitted a proof of loss by which she assigned a value of $162,736 – equal to the Policy limit – to the stolen property.  McCurdy Decl., Ex. 7.  Plaintiffs accompanied the proof of loss with a list of the stolen property and estimated values for each item.  Id.  Hall testified that the values were based on Internet research and a Civil War book.  Id., Ex. 4, 30:22-31:12.  The total value of the items on this list as estimated by Plaintiffs was between $54,625 and $109,625 (based on range in value for the Civil War jacket of $25,000 to $80,000), which is less than the amount stated in their proof of loss.  See id., Ex. 7.

On January 3, 2007, Defendant informed Hall that it had begun its investigation of the claim.  Dkt. 48, Pyle Decl., Ex. 8.  On February 21, 2007, Plaintiffs submitted a second proof of loss, which assigned a value of $99,000 to the stolen property.  Id., Ex. 10.  Defendant rejected the proof on February 21, 2007, on the ground that the document did not comply with the Policy because various items of information were omitted.  Wyatt Decl., Ex. 13.  Defendant informed Plaintiffs that they could submit a new proof of loss that complied with the Policy by no later than April 21, 2007, and, if one was not received, it would "consider the matter closed."  Id.

On February 22, 2007, Defendant advised Hall that it could not yet confirm or deny her claim and requested a properly executed proof of loss and further documentation supporting Plaintiffs' claim.  Id., Ex. 12.  On February 28, 2007, Hall emailed Defendant, complaining about Defendant's rejection of Plaintiffs' proof of loss.  Id., Ex. 13.  In her email, Hall stated "I will see what I can do to resubmit this claim to [Defendant] this week."  Id.  There is no indication in the record that Plaintiffs resubmitted their proof of loss.

On March 21, 2007, Defendant sent Hall a check for $945.48.  Id., Ex. 15.  Defendant also sent Plaintiffs a letter under separate cover, explaining that several items on Plaintiffs'

proof of loss had not been evaluated "due to the fact that their replacement value is over $500 and we have not received any type of documentation verifying ownership of these items. We have also priced these items as replicas as we have not received any type of documentation verifying their authenticity." Id. The letter also advised Plaintiffs that they could submit such documentation for review. Id. Plaintiffs responded, telling Defendant "[d]o not send the $945.48 check," as it was Plaintiffs' belief that Defendant was not "honoring" the Policy, and stating that Ryan was willing to make a statement regarding the items' antique nature. Id., Ex. 16. On March 27, 2007, Defendant wrote Plaintiffs, explaining that the March 21, 2007 payment was not necessarily the final payment on the claim, and requesting a statement from Ryan advising "each item he is aware of, how he knows that it is an antique and how he can document it." Id., Ex. 17.

Plaintiffs obtained and sent to Defendant an affidavit from Ryan, dated April 3, 2007. Id., Ex. 18. Ryan stated that he is a "gun enthusiast, loves antiques, collectibles, paintings, civil war artifacts and movie memorabilia." Id. Ryan explained his acquisition of the Civil War jacket as follows:

> The CIVIL WAR OFFICER'S JACKET was an authentic Confederate Officer's Frock Jacket. I purchased this jacket many years ago at a Texas flea market. The elderly man I purchased the jacket from had a very old black & white photo with a man in the jacket. He told me this jacket had belonged to his great grandfather.

Id. Ryan also stated that "I purchase [sic] an authentic Indian outfit, including a full headdress from a tribe in Montana quite a few years ago. The Indian Tribe was Blackfeet Tribe, Browning Montana." Id.

On April 17, 2007, Defendant wrote Hall, explaining that it was processing a check for $16,652.83, which represented replacement value for stolen property of $21,963.91, less depreciation, deductible, and Defendant's prior payment. Id., Ex. 19. Defendant stated that "[w]hile you have provided an affidavit from Mr. Ryan attesting to the fact that he owned a Civil War Officer's Jacket and an Indian Outfit Including Full Headdress, we have received nothing supporting their authenticity. For this reason, these items as well as all other items claimed to be 'authentic' have been priced as replicas." Id.

Hall responded on April 24, 2007, stating that Plaintiffs would not be cashing the two checks previously sent by Defendant. Id., Ex. 20. Hall again disputed Defendant's valuation of the stolen items. Id. She asserted that Ryan's viewing of an "old civil war[] photo of the jacket" confirmed its authenticity. Id. Hall also asserted that the Navajo blankets dated to sometime between the 1920s and 1940s, and were therefore more valuable. Id. Moreover, Hall asserted that the Blackfeet headdress was severely undervalued, and attached a printout from the Blackfeet Nation Store, which listed a breastplate for $1,000 and a war shirt for $5,000. Id. Hall also asserted that the house contained "15 to 20" knives, and stated that Ryan confirmed in his affidavit that most of those knives were Randall knives. Id.

Defendant responded on May 1, 2007, explaining that the Policy required Plaintiffs to submit documentation as to the replacement value of property, and that Ryan's affidavit, while sufficient to establish that he owned the items at issue, was not sufficient to authenticate the items. Id., Ex. 21. Defendant also asked what qualifications Ryan or the seller have in regards to authenticating the Civil War jacket. Id. Defendant indicated that it "need[s] a document showing it was inspected by a qualified individual and authenticated," and that "would be the same for the Indian blankets, headdress and outfit." Id. With respect to the knife collection, Defendant stated that it could research the pieces individually if provided an itemized list, but that it could not do so when provided with "a lump sum." Id.

On May 11, 2007, Defendant interviewed Ryan. Id., Ex. 24. Ryan said he bought the Civil War jacket for $150 at a flea market and described the condition of the jacket as "like an old rag and was beat up," "covered with age," "not in good condition," and "faded from the original color." Id. Ryan also stated that he was sure the jacket was authentic because it was hand-stitched and had three brass buttons that read "CSA." Id. Ryan explained that he was once offered $3,000 for the jacket, but he did not sell it because he thought he could get up to $5,000 from the right buyer. Id. Ryan also estimated the value of some of the other stolen items. Id. He valued the Blackfeet headdress at $600-$700, the gold piece at $50, the three Navajo blankets at about $1,000 total, and indicated that the staghorn service set was

"priceless." Id. Ryan was not sure about the value of the knives, and explained that they were "everyday" knives without extraordinary value. Id.

On June 11, 2007, Defendant sent a letter to Hall, advising her that Defendant had "enough information from Mr. Ryan to determine the items in question were authentic." Id., Ex. 25. Defendant also explained that, to "value the items listed as authentic," it hired an independent appraiser to "determine the actual cash value of the items in question in today's market." Id. Defendant further explained that the appraiser "will review your documentation, photos, Mr. Ryan's explanation of each item and his value of the items. The appraiser will do their own research into the Civil War and Indian Artifacts then present us with their evaluation. We will then pay based upon that evaluation." Id. The letter also notified Hall of the Policy's appraisal provision. Id.

### D.  DEFENDANT'S APPRAISAL

On June 13, 2007, Defendant asked Hall to provide it with whatever information she had regarding the condition of the jacket and the Blackfeet outfit. Id., Ex. 27. Hall responded by suggesting that Defendant contact Lake. Id. By this time, Defendant had retained Heide Bumann, an appraiser certified by New York University, who had training and experience in appraising historical items, including Civil War items. Id., Exs. 28, 29; McCurdy Decl., Ex. 40 (Bumann Dep. Tr.), 4:2-28:16. Bumann interviewed Lake, and consulted with an appraiser who specializes in Civil War memorabilia. Wyatt Decl., Ex. 29. In her June 15, 2007 appraisal report to Defendant, Bumann concluded that "at this point the authenticity and specific description of the coat isn't definitive. There is conflicting information that points to a need for further detailed interviewing and investigation to determine if the Ryan coat and the Hall/Lake coat are actually the same." Id. Bumann also stated "if they are the same coat, after researching Civil War confederate coat sales, it is clear that authentic original Civil War Confederate uniforms of any kind are extremely rare … also, they were in good condition or better, complete with buttons, linings, belts, etc. The trim, insignia and epaulets were attached and in good condition." Id.

On June 19, 2007, Defendant wrote to Hall, explaining that discrepancies existed between Lake's and Ryan's descriptions of the jacket. Id., Ex. 30. The letter stated that Defendant retained an appraiser who, working with a Civil War expert, would provide recommendations to Defendant. Id. The letter further stated that Defendant would "advise [Hall] of our findings and conclusions regarding the authenticity of the civil war jacket." Id. The letter further explained that Defendant would pay $2,500 for the Blackfeet headdress and outfit, which was the value attributed to those items by Bumann. Id., Exs. 29, 30. Also, the letter stated that Defendant would pay an additional $6,487.82 for some of the Stolen Items. Id., Ex. 30. The letter further stated that the only outstanding items were the value of the Civil War jacket and the staghorn set. Id.

On June 19, 2007, Bumann sent a letter to Defendant, in which she stated "[i]n my opinion, it would be impossible to determine the authenticity of the missing coat with the current information. However, I believe it is more unlikely than likely that it is authentic." Id., Ex. 31. Bumann also stated:

> It is also unlikely that the item was purchased for only $150 at a flea market. But it is, of course, possible. Rarely are items of great rarity and value found at low prices, but occasionally it does occur. Replica coats are sold in the $300 to $500 range and are readily available. People have been re-enacting Civil War scenarios for many years. There are very few Civil War Confederate coats on the market. When available, they are listed at military auction houses …." Id.

Defendant advised Hall of Bumman's conclusions by letter dated June 25, 2007. Id., Ex. 32.

On June 25, 2007, Hall wrote to Defendant, stating that Lake was at work when Bumann called and did not understand all of the questions. Id., Ex. 33. Hall discussed Lake's description of the jacket, explaining that Lake had not meant to say that the jacket had no buttons, but that he did not know what was written on the buttons. Id.

On June 29, 2007, Defendant emailed Hall and explained that its payments were based on statements by Ryan and the investigation by Bumann and the Civil War expert. Id., Ex. 34. By email dated July 3, 2007, Hall argued that Defendant previously concluded that the jacket was authentic, and on that basis, could not now take the position that the jacket was not authentic. Id., Ex. 35. On July 5, 2007, Defendant reiterated the basis for its valuation. Id.

**1**  Defendant conducted no further factual investigation or interviews regarding the Civil
**2** War jacket's authenticity after receiving Bumann's June 15, 2007 appraisal report. Dkt. 53-1,
**3** Campbell Decl., Ex. 5 (Pence Dep. Tr.), 166:15-22. It was Defendant's position that they had
**4** "already spoken with everybody." Id., 149:21-150:4.

**5**        E.    PLAINTIFFS' INVOCATION OF THE POLICY'S APPRAISAL PROVISION

**6**  On February 22, 2008, Hall wrote Defendant, requesting a "final decision on the Civil
**7** War jacket." Wyatt Decl., Ex. 36. Hall also stated that she "would like to exercise [her] right
**8** to arbitration and appraisal" regarding the following items: the Civil War jacket, the Blackfeet
**9** outfit, the gold piece, the knife collection, and the staghorn set. Id. Hall did not identify an
**10** appraiser in that letter. By this time, Defendant had paid Plaintiffs $2,500 for the Blackfeet
**11** outfit, $2,000 for the Navajo blankets, $407.81 for the Civil War jacket, $3,000 for the knife
**12** collection, and $200 for the staghorn set. Id., Exs. 30, 32. Defendant did not pay for the gold
**13** coin. Id. Thus, Defendant paid a total of $25,126.29 for the entire claim. Id.

**14**  On March 18, 2008, Defendant wrote Hall, stating: "Please review the letter we mailed
**15** to you on June 11, 2007. The letter quotes the policy referring to the policy conditions,
**16** Replacement cost, appraisal and Suit against us. The policy states you have one year from the
**17** date of loss to start the action to dispute your claim. That date expired on December 17, 2007."
**18** Campbell Decl., Ex. 2 at FN 170.

**19**  On September 2, 2008, counsel for Plaintiffs wrote Defendant, indicating that Plaintiffs
**20** dispute Defendant's determination that the Civil War jacket is not authentic. Id., Ex. 2 at FN
**21** 160. Counsel also indicated that Plaintiffs had selected John Sexton as their appraiser. Id.
**22** There is no evidence in the record that Sexton conducted an appraisal.

**23**        F.    PLAINTIFFS' TESTIMONY

**24**  Plaintiffs Lake and Hall have both been deposed in this matter. Lake testified as to his
**25** belief that the Civil War jacket was authentic because "it was old, it was a uniform, [and] it
**26** was hand-stitched." McCurdy Decl., Ex. 3, 54:16-22. Lake testified that the jacket was
**27**
**28**

accompanied by boots, pants, and a belt with "CSA" stamped on the buckle. Id. at 57:19-24.[2] Lake testified that he could not remember anything about the jacket other than that it was old and hand-stitched. Id., Ex. 3, 115:9-12.

Lake is not an antique collector. Id. at 76:14-15. Hall bought and sold antiques prior to the burglary, but never dealt in Civil War items or Native American items. Id. at 76:16-25. Lake testified that, prior to the burglary, he had not seen an authentic Civil War jacket in person. Id. at 108:11-20. Neither had Hall. Id. at 108:21-25.

Hall testified that she estimated the Civil War jacket's value based on values listed in a Civil War antiques book. Id., Ex. 4, 55:8-13. Hall never saw the Civil War jacket. Id. at 63:2-3. Hall testified that Ryan told her that the jacket had epaulets and buttons inscribed "CSA," was free of tears, and was handmade. Id. at 91:6-18. Hall testified that she saw each of the other Stolen Items. Id. at 63:4-6. Hall testified that Plaintiffs valued the gold piece at $699 based on Hall's memory of "1908" being inscribed on the coin and the value of gold coins from that era. Id. at 94:13-96:15.

### G. RYAN'S TESTIMONY

Ryan's deposition testimony set forth a different version of events surrounding his acquisition of the Civil War jacket from those set forth in his affidavit or his interview. Ryan testified that he purchased the jacket for $60 to $65 at a garage sale in Texas. Id., Ex. 37 (Ryan Dep. Tr.), 23:4-9. Ryan testified that the garment was "more like a shirt" or tunic than a jacket. Id. at 22:2. According to Ryan, the garment was faded gray and had worn elbows, missing buttons, and a permanent sweat stain. Id. at 22:8-18: 26:1-8. The garment lacked any insignia. Id. at 28:6-8. Ryan testified that the only Civil War related artifact he previously purchased was a shotgun. Id. at 29:20-23. Ryan testified that the garment was made of cotton, not wool. Id. at 29:8-10.

Ryan testified that the woman who sold him the jacket never showed him a photograph of someone wearing the jacket. Id. at 27:12-25.[3] Instead, according to Ryan's testimony, he

---

[2] Ryan testified in his deposition that he had never purchased the boots or pants. Id., Ex. 37, 62:17-22.

once took the jacket to a gun show in Sacramento, California, where he was shown a photograph from the Civil War era of soldiers in uniform. Id. at 52:5-53:22. Ryan testified that a man at the gun show, identified only as Ralph, told him that the garment would be worth between $4,000 and $5,000 if it were in good condition. Id. at 22:8-18.

Ryan was asked the basis for his conclusion that the jacket was authentic and responded:

> We'll, I've seen photos of them before; I've seen them on mannequins before; I have enough general knowledge to tell if something is – hand-sewn or machine-sewn. And sometimes, you know, you just look at something and you know if it's real or if it's phony. Just from past experience, I reckon. Id. at 60-24:61:6.

Ryan testified that he purchased the Blackfeet headdress at the Flathead Reservation in Montana. Id. at 31:20-32:20. Ryan remembers paying less than $200 for the headdress. Id. at 32:19-20.

### H.   PLAINTIFFS' DISCOVERY RESPONSES

In discovery in this action, Plaintiffs were asked to state all facts supporting their contention that the Stolen Items were authentic. McCurdy Decl., Exs. 38 and 39, Resp. to No. 4. As to the jacket, Plaintiffs cite the statement in Defendant's June 11, 2007 letter that the jacket was authentic. Id. Plaintiffs rely on their characterization of Defendant's investigation to establish the jacket's authenticity. Id. Specifically, Plaintiffs state their understanding that the facts that led Defendant to conclude that the jacket was authentic were: "the type of wool used to make the jacket, the jacket was hand stitched, Bob Ryan saw a photograph from the Civil War era of a person wearing the jacket and Bob Ryan was a knowledgeable collector of authentic civil war items and once turned down a $3,000 purchase offer for the jacket because he was certain it was authentic and in his opinion it was worth more." Id.

Plaintiffs contend that the Blackfeet headdress and outfit, the Navajo blankets, and the gold piece are authentic based on Defendant's investigation. Id. Plaintiffs contend that the remaining items are authentic without citing any factual support. Id. The only documents

---

[3] The Court refers herein to the garment as a "jacket," although it is unclear, in view of Ryan's testimony describing it as a tunic or shirt, that it was indeed a jacket.

Plaintiffs identify in support of their claimed values for the Stolen Items are the documents Plaintiffs produced in this action. Id., Resp. to No. 9. In their most recent discovery responses, Plaintiffs do not identify any documents supporting their contentions regarding the value of each of the stolen items. Id., Exs. 41, 42, Resp. to Nos. 3 and 6.[4]

## II. PROCEDURAL BACKGROUND

On September 23, 2008, Plaintiffs filed this action in the Superior Court of California, County of Alameda. Dkt. 1, Ex. 1. On January 16, 2009, Plaintiffs filed their first amended complaint. Id. Plaintiffs allege causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, based on Defendant's alleged failure to resolve the parties' dispute relating to the value of certain items pursuant to the policy's appraisal provision, and Defendant's resulting failure to fully compensate Plaintiffs for the loss. Plaintiffs seek, among other things, punitive damages. On February 24, 2009, this action was removed to this Court on diversity grounds. Id.

Previously, Defendant moved for summary judgment, asserting that Plaintiffs' suit is time barred under a provision in the Policy that states that an action under the Policy must be brought within one year after the inception of the loss. The Court denied that motion, explaining that the one year period is equitably tolled from the time the insured files a timely notice of loss to the time the insurer formally denies the claim in writing. Dkt. 41. The Court found that the evidence submitted was sufficient to create a fact issue as to when Defendant denied coverage or settled Plaintiffs' claim, thus ending the equitable tolling period. Id.

Defendant now moves for summary judgment on Plaintiffs' breach of contract and implied covenant claims on the ground that Plaintiffs have not produced sufficient evidence showing that they were denied policy benefits. Alternatively, Defendant argues that, in the

---

[4] Without elaboration, Plaintiffs summarily object to the following exhibits cited in the Court's factual summary as containing inadmissible hearsay: Exhibits 8, 12, 15, 17, 19, 21, 24, 25, 27, 29, 30-34, and 37. Dkt. 53-11. However, these objections are impermissibly vague. Moreover, these documents are records of Defendant's regularly conducted business activity, and are thus admissible under Federal Rule of Evidence 803(6). Therefore, these objections are overruled. Plaintiffs' objections to Defendant's remaining exhibits are overruled as moot, as it was not necessary for the Court to consider these documents, given that they are duplicative of other evidence in the record or are not probative of any material issue of fact.

event the Court does not dismiss the implied covenant claim, Plaintiffs' prayer for punitive damages should be dismissed on the ground that there is no evidence of oppression, fraud, or malice.

### III. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"  Ricci v. DeStefano, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248.  Factual disputes are genuine if they "properly can be resolved in favor of either party."  Id. at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).

## IV. ANALYSIS

### A. BREACH OF CONTRACT CLAIM

"To be entitled to damages for breach of contract, a plaintiff must plead and prove (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." Troyk v. Farmers Group, Inc., 171 Cal.App.4th 1305, 1352 (2009). Here, Plaintiffs claim that Defendant breached the insurance policy by failing to acquiesce to Plaintiffs' invocation of the appraisal provision, and that Plaintiffs were damaged by Defendant's resulting underpayment of their claim.

#### 1. Plaintiffs Have Submitted No Credible Evidence That They Were Damaged

Defendant argues that summary judgment should be granted on Plaintiffs' breach of contract claim because there is no evidence that Plaintiffs were damaged. In other words, Defendant argues that Plaintiffs have submitted no credible evidence to support their theory that the items are valuable antiques, and that Defendant should have thus paid more for them under the Policy. In support of that argument, Defendant directs the Court to Plaintiffs' discovery responses. When asked to state facts demonstrating the authenticity of the items, Plaintiffs point to Defendant's alleged conclusion that the items were authentic, and factors that Plaintiffs believed Defendant relied upon in reaching that conclusion. Plaintiffs never demonstrate, however, that Defendant ever valued the items as actual rare or antique artifacts. Moreover, Plaintiffs were asked during discovery to identify all documents that support their claims. Plaintiffs identify the documents exchanged by the parties, but do not identify any specific documents supporting their claims that some of the items are authentic, or supporting their claims regarding the value of the items. The Court notes that, under the Policy, it is Plaintiffs' burden to "[a]ttach all bills, receipts and related documents that justify the figures in the inventory" to their loss claim. Wyatt Decl., Ex. 1 at 36.

Furthermore, Defendant asserts that the percipient testimony, taken in its best light, cannot establish that the Stolen Items were worth more than Plaintiffs were paid. Hall never saw the jacket. McCurdy Decl., Ex. 4, 63:2-3. Lake saw the jacket for less than five minutes

1 and his testimony, taken in the best light, establishes only that the jacket was gray, old, striped, made of wool, and hand-stitched. Id., Ex. 9; Ex. 3, 54:16-22, 55:9-13. Ryan's inconsistent testimony is also not probative. He has given two conflicting accounts of how he acquired the jacket. Neither account, if accepted as true by a jury, establishes that the jacket is authentic. In the account he gave during the claims stage, Ryan was told by the seller of the jacket at a Texas flea market that the jacket belonged to the seller's great-grandfather, and was shown a photograph purportedly of the great-grandfather wearing the jacket. Wyatt Decl., Exs. 18, 24. The seller's statement and photograph do not support Plaintiffs' inference that the jacket was authentic; rather, at most, it supports the conclusion that the seller's great-grandfather once wore the jacket and had his picture taken wearing it.

Ryan's most recent account of the jacket's acquisition is even less helpful to Plaintiffs. In that account, Ryan declared that he purchased the jacket from a woman in Texas who told him that the jacket was authentic. Her statement is conclusory, lacks foundation, and is inadmissible hearsay. See Fed. R. Evid. 801, 802. Ryan's recent account also includes his statement that a man at a gun show in Sacramento, where Ryan took the jacket, told him the jacket might have some value, if it were in better condition. Aside from its negligible probative value, that statement is also inadmissible hearsay; additionally, there is no evidence that the unidentified man at the gun show had any expertise in identifying Civil War clothing.

Furthermore, Defendant has submitted the declaration of William Gorges, a certified appraiser with experience in Civil War memorabilia, including Civil War uniforms and jackets. Dkt. 46, Gorges Decl., ¶ 1. Gorges asserts that actual Civil War uniforms and jackets were rarely found at flea markets or house sales anywhere in the United States during the 1990s, when Ryan acquired the jacket. Id., ¶ 2. Gorges also asserts that replica Civil War jackets and uniforms, including jackets and uniforms made for veteran groups in the late 1880s, were far

more common at flea markets and house sales anywhere in the United States during the 1990s. Id., ¶ 3.[5]

Assuming the jury found both Ryan and Lake entirely credible, the most their testimony would establish is that the garment was old, they thought it was hand-stitched, and to their eyes resembled what they believed a Civil War jacket or tunic might look like. Given that, according to Gorges, replica Civil War jackets are far more common than authentic ones, no reasonable jury could conclude from Plaintiffs' evidence that the jacket was authentic.

The same is true of the remaining items. Indeed, if Ryan's valuation of the items was accepted, Plaintiffs have been overpaid for the items they claim are at issue. Of note, Ryan was the only witness who has detailed knowledge of the Stolen Items. Defendant paid Plaintiffs $2,500 for the Blackfeet headdress, which Ryan valued at $600. Defendant paid $2,000 for the Navajo blankets, which Ryan valued at a total of $1,000. Defendant paid $3,000 for the assorted knives. Ryan stated they were "nothing of extraordinary value – things you can get easily today." McCurdy Decl., Ex. 24. Defendant paid $200 for the staghorn set, pursuant to Bumann's appraisal. Finally, Ryan indicated that he never purchased the Civil War boot or pants.

Accordingly, the submitted evidence does not support Plaintiffs' claim that they were damaged by Defendant's alleged breach of the Policy. In sum, Plaintiffs have submitted no credible evidence to support their theory that the items are more valuable than what was paid under the Policy.

**2.    The Willis Testimony Does Not Create any Triable Issue of Fact**

In support of their opposition, Plaintiffs have submitted the opinion of Martin Willis, an experienced appraiser. Dkt. 53-10, Willis Decl. Plaintiffs assert that this testimony creates an issue of fact as to the authenticity of the Stolen Items at issue. Specifically, as to the Civil War

---

[5] Plaintiffs object to paragraph 3 of the Gorges Declaration, on the ground that the opinion stated is not relevant to the value of the Civil War jacket at issue, lacks foundation, and is vague and ambiguous. Dkt. 53-11. This objection is overruled, as this testimony is clear and is directly relevant to the issue of whether the jacket is more likely a replica. Moreover, Gorges lays the foundation for this testimony by setting forth his relevant experience in his declaration.

jacket, Willis states "I have carefully reviewed the transcripts and <u>I do not have an opinion one way or another as to the authenticity of the jacket</u>." <u>Id</u>., Ex. A at 1 (emphasis added). He nevertheless opines, "[b]ased on Bob Ryan's interview notes, and the current information," that the jacket is worth between $15,000 and $35,000. <u>Id</u>. at 2. He also indicates that his opinion is "based on a similar one I handled a few years ago that sold for around $37,000." <u>Id</u>. He "also researched and found several auction records on LiveAuctioneers which is a database containing past auction records." <u>Id</u>.

Plaintiffs argue that Willis' testimony raises a question of fact as to the value of the jacket because Willis indicates the jacket had "attributes of authenticity sufficient to increase its market value above that of ordinary replica jackets." Plfs.' Opp. at 13. However, "[c]onclusory expert assertions cannot raise triable issues of material fact on summary judgment." <u>Sitrick v. Dreamworks, LLC</u>, 516 F.3d 993, 1001 (Fed. Cir. 2008). Here, Willis concedes he has no opinion as to the jacket's authenticity. He acknowledges he never saw or handled the jacket, and instead relied on Ryan's testimony. Of note, it is not clear from the evidence presented that Ryan and Plaintiffs are even referring to the same item when they speak of the "Civil War jacket," given that Ryan testified that the garment was more like a tunic or a shirt than a jacket.

In that regard, <u>Triton Energy Corp. v. Square D Co</u>., 68 F.3d 1216 (9th Cir. 1995) is instructive. There, a fire damaged an airplane hangar and the airplanes inside of it. An allegedly defective circuit breaker was destroyed before it could be tested to determine whether it caused the fire. The manufacturer of the circuit breaker, who had been sued for the breaker's alleged role in causing the fire, moved for summary judgment.

In opposition, plaintiff offered an expert declaration from Douglas Bennett, who opined that the circuit breaker must have been defective when it left the factory, and specified the design defects that he believed caused the fire. Bennett testified that his opinion was based on modifications that defendant's expert testified were made to the circuit breaker's case. The court held that Bennett's declaration could not defeat summary judgment by creating a fact issue:

> Trinton's entire case rests precariously on the opinion of its expert, Douglas Bennett, who never examined the allegedly defective circuit breaker. This substantially impaired his ability to express a reliable expert opinion based upon specific facts. Therefore, we find that Bennett's expert opinion and the inferences Trinton seeks to draw from it are not of sufficient quantum or quality to create genuine issues of material fact. Id. at 1222.

The same rationale applies here. Willis is attempting to value a jacket that he has never seen and for which he admittedly has no opinion on authenticity. Willis, like Bennett, is wholly reliant on partial (and, here, inconsistent) descriptions of the jacket. As in Trinton, Willis' expert opinion and the inferences Plaintiffs draw from it are not sufficient to defeat summary judgment.

In addition, Plaintiffs offer testimony from Willis regarding the Blackfeet outfit and staghorn set, which is also insufficient to create a triable issue of fact. Willis never saw the items, has only a scant description of them, and therefore cannot meaningfully opine on their value.

Furthermore, as to the Blackfeet items, Willis opines that the replacement cost for a headdress and "plain leather shirt and leggings" is in the range of $2,500 to $3,500. Willis Decl., Ex. A at 3. Defendant paid $2,500 for the headdress, which is within Willis' range. In addition, Willis' value includes a "plain leather shirt" and "plain moccasins." There is no evidence in the record that the Blackfeet outfit included a shirt or moccasins, and Ryan testified that he never purchased such items. McCurdy Decl., Ex. 37 at 32:24-33:20. Therefore, Willis' valuation includes items that are not even in Plaintiffs' list of Stolen Items.

Finally, Willis opines that the staghorn set is worth $800 based on "auction records for staghorn animal cutlery sets." Willis Decl., Ex. A at 3. Willis provides no factual basis for the value, however, because he provides no background about the purported auction listings. Further, he does not have any description of the serving set, and even admits "it is difficult to envision." Id. Thus, this evidence is not sufficiently probative to support a jury finding in Plaintiffs' favor. Plaintiffs offer no evidence as to the value of the other Stolen Items.

In sum, Willis' testimony fails to create an issue of fact as to the authenticity or value of the Stolen Items at issue, so as to withstand summary judgment.

### B. BREACH OF IMPLIED COVENANT CLAIM

"In order to establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show (1) benefits due under the policy were withheld, and (2) the reason for withholding benefits was unreasonable or without proper cause." Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001). In first party cases, like this one, "benefits due" means payment for covered losses. See Major v. Western Home Ins. Co., 169 Cal.App.4th 1197, 1210 (2009) ("The gravamen of a first party [bad faith] lawsuit is a breach of the implied covenant of good faith and fair dealing by refusing, without proper cause, to compensate the insured for a loss covered by the policy ... or by unreasonably delaying payments due under the policy.") (brackets in original); Love v. Fire Ins. Exchange, 221 Cal.App.3d 1136, 1153 (1990) ("Our conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is rooted.").

In this case, Plaintiffs assert that Defendant acted in bad faith by rejecting their appraisal demand without proper cause. Plaintiffs also assert that Defendant "lied" to Plaintiffs regarding their ability to invoke the appraisal provision and about the determination that the jacket was more likely inauthentic than authentic. Furthermore, Plaintiffs assert that there are inconsistencies in the testimony of Defendant's witnesses regarding the handling of the Bumann appraisal. However, as indicated above, Plaintiffs cannot show that the Stolen Items are worth more than Defendant has already paid for them. Plaintiffs, therefore, cannot show that they are due payments under the Policy. Nor do Plaintiffs argue that payments were unreasonably delayed under the Policy. Under the evidence presented, Plaintiffs' bad faith claim cannot be maintained.

### C. PUNITIVE DAMAGES CLAIM

As a final matter, Plaintiffs seek an award of punitive damages based on their breach of implied covenant claim. To recover punitive damages, Plaintiffs must demonstrate by "clear and convincing" evidence that Defendant's conduct constitutes oppression, fraud or malice. Cal. Civ. Code § 3294. Defendant moves for summary judgment on Plaintiffs' punitive

damages claim on the ground that they have failed to make such a showing. The Court agrees. As indicated above, Plaintiffs' underlying breach of implied covenant claim cannot survive summary judgment, as Plaintiffs have failed to present sufficient evidence showing that Defendant denied them benefits under the Policy. Moreover, there is no evidence to support Plaintiffs' contention that Defendant's conduct constitutes oppression, fraud or malice. Accordingly, Defendant's motion for summary judgment is also granted on this issue.

## V. **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary is GRANTED in its entirety.

IT IS SO ORDERED.

Dated: November 16, 2010

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge